AO 106 (Rev. 04/10)  Application for a Search Warrant

E-FILED
Thursday, 08 March, 2018  04:35:09 PM
Clerk, U.S. District Court, ILCD



# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with Facebook User ID<br>00003644581513, More Particularly Described on<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) Case No.  18-MJ- *7048* |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached hereto and incorporated herein.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is attached hereto and incorported herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute methamphetamine |
| 21 U.S.C. § 841(a)(1) | Distribution of methamphetamine |

The application is based on these facts:

See attached Affidavit of FBI Special Agent Justin Tennyson

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/JUSTIN TENNYSON

*Applicant's signature*

Justin Tennyson, FBI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

s/ERIC I. LONG

Date:  ____03/08/2018____

*Judge's signature*

City and state:  Urbana, Illinois

Eric I. Long, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100003644581513 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. ___18-MJ-7048___<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Justin Tennyson, Federal Bureau of Investigation, being first duly sworn, hereby state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID 100003644581513 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Title 18 U.S.C. 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with user ID 100003644581513.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since July 2014. I am currently assigned as the coordinator for the Eastern Illinois Violent Criminal Enterprise and Drug Trafficking Organization Task Force located in Champaign, Illinois. During my time as a Special Agent, I have conducted successful investigations into complex criminal enterprises, including drug trafficking organizations. I have spoken to numerous drug

2:18-mj-07048-EIL   # 1    Page 3 of 26

traffickers and have had the opportunity to gather information from them about how they use cellular phones and social media applications to communicate with each other during the course of their drug trafficking activities. This information has led to additional investigative leads as well as the identification of co-conspirators, sources of controlled substances, customers, location of sources and "stash" locations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 (conspiracy to distribute a controlled substance) and 841(a)(1) (distribution of a controlled substance) have been committed, are being committed, and will be committed by MARQUIS THOMPSON and other known and unknown persons. There is also probable cause to search the information described in Attachment A for evidence of this crime, as described in Attachment B.

## INVESTIGATION AND PROBABLE CAUSE

5.      The United States government, including the FBI, is investigating MARQUIS D. THOMPSON and others based in part on information provided by confidential sources (CS's) who are or were affiliated with THOMPSON and/or members of his Drug Trafficking Organization (DTO). These sources have provided organizational, drug trafficking, and other information to law enforcement agents and officers.

6.      An FBI confidential human source (CS-1) was used from October 7, 2016 through February 10, 2017. CS-1 was working in exchange for the possibility of leniency on potential

charges after law enforcement seized approximately two ounces of ice and a loaded handgun from him during a local investigation. Law enforcement used CS-1 to conduct a controlled purchase of four ounces of methamphetamine from THOMPSON on October 7, 2016. Through the controlled purchase and other investigative methods, including physical surveillance and lawfully obtained text messages, law enforcement found CS-1 to be providing truthful and reliable information about THOMPSON while he was being used. CS-1'S cooperation was terminated in early 2017 after law enforcement discovered he was contacting THOMPSON regarding drug trafficking outside the contours of his cooperation.

7.      CS-1 stated that one of the methods used to communicate with THOMPSON was via Facebook Messenger. During these conversations, THOMPSON used a fictitious account under the username "James Cason". A search of Facebook did not locate this account and it is believed that THOMPSON has since deleted the account or it is not a publically available account.

8.      Law enforcement agents reviewed the publicly available Facebook page of THOMPSON (hereafter Target Account). The Target Account's User ID is 100003644581513 with vanity name marquis.thompson.963. The Target Account contained several photographs of an individual believed to be THOMPSON based off a comparison with his Illinois driver's license photograph. THOMPSON posted in the Introduction section of the page that he was a carpenter with the United Brotherhood of Carpenters and Joiners of America. It also stated that he went to Champaign Central High School, lives in Urbana, Illinois, and is from Milwaukee, Wisconsin. Several of THOMPSON's posts include images of rap concert promotional posters that were created by THOMPSON PROMOTIONS, THOMPSON's now-defunct business. This page was last updated on March 5, 2018 where a photograph of himself was posted. Agents therefore believe the Target Account is associated with, and used by, THOMPSON.

3

9.      A Court Order pursuant to Title 18 United States Section 2703(d) for the Target Account was served to Facebook on January 25, 2018 for records and information from October 1, 2016 through the present.  On February 8, 2018, Facebook provided the requested records to the FBI. A review of the records for the Target Account revealed that it is an active account that is subscribed to MARQUIS THOMPSON, e-mail addresses deonthompson1989@gmail.com and donishaedwards@gmail.com, with verified cellular telephone numbers 12173771060, 12174197165, 12173908046, 12175504662, 12172550925 and 12173773957.  The Target Account was created on March 4, 2012.  I know from my training and experience that it is common for drug dealers to use multiple phones and telephone numbers to avoid detection.

10.      Agents have confirmed that one of the verified cellular account numbers on the Target Account belongs to THOMPSON.  An administrative subpoena served to Sprint for 12174197165 revealed an International Mobile Subscriber Identity ("IMSI") 310120215719916, which is subscribed to "Marquis Thompson," with street address 1205 E. Delaware, Urbana, IL 61801.  This cellular account number has also been used on THOMPSON PROMOTIONS rap concert posters.

11.      The Target Account has a total of 565 contacts, which are other accounts/users that THOMPSON has communicated with. One of THOMPSON's contacts include User ID 100008354147324 with user name NICHOLAS NIEMEYER (hereafter N. NIEMEYER).  CS-1 has provided information that THOMPSON is distributing ice to N. NIEMEYER, who resides in Teutopolis, Illinois.  The Facebook records received on February 8, 2018 revealed that N. NIEMEYER has sent the Target Account six messages from April 19, 2017 – September 11, 2017.

4

2:18-mj-07048-EIL  # 1  Page 6 of 26

12.     Agents have surveilled in person meetings involving apparent drug transactions between THOMPSON (and others he uses to complete drug transactions) and N. NIEMEYER, including on November 30, 2016, when THOMPSON and N. NIEMEYER met briefly at the Showplace 10 Theater in Mattoon, Illinois. After that brief meeting, both N. NIEMEYER and THOMPSON then drove to Wendy's in Mattoon, where N. NIEMEYER met with an unknown black female who had traveled with THOMPSON from Champaign, and whom THOMPSON had dropped off at the Wendy's just prior to meeting with N. NIEMEYER at the theater. After the female briefly entered N. NIEMEYER's truck, she returned to THOMPSON's vehicle, and they returned to Champaign. Lawfully obtained text message communications between THOMPSON and N. NIEMEYER from November 30, 2016, revealed N. NIEMEYER asking if THOMPSON "[w]ant[ed] to go to the movies th[at] afternoon," and claiming he had "4 tickets," which agents believe meant he was seeking 4 ounces of methamphetamine. Based upon these lawfully obtained text message communications and the nature of the meeting on November 30, 2016, agents believe THOMPSON met N. NIEMEYER to distribute 4 ounces of methamphetamine.

13.     Multiple search warrants that have been served on N. NIEMEYER's cellular telephone account (217-663-9258) at Verizon Wireless have detailed several relevant conversations between THOMPSON and N. NIEMEYER where N. NIEMEYER described the quantity of "ice" he was requesting as well as other logistical information, i.e., when and where they could meet to deliver the drugs. For instance, a search warrant was served to Verizon Wireless on November 16, 2017. This revealed a pertinent conversation between THOMPSON and N. NIEMEYER on October 27, 2017, where THOMPSON asked N. NIEMEYER what time he was going to see him as well as "how many" N. NIEMEYER was wanting. The response from N. NIEMEYER was "8," and THOMPSON then detailed when he would be available to either drop

off or deliver the "ice" to N. NIEMEYER. I believe this meant that N. NIEMEYER was requesting eight ounces of "ice" to be delivered to him. THOMPSON has continued to meet with N. NIEMEYER throughout the investigation, including a suspected meeting on December 14, 2017, at the Arrowhead Lanes in Champaign, and a March 1, 2018 meeting at the Wal-Mart in Savoy, Illinois. Based upon the lawfully seized text message communications, and monitoring of phone traffic between THOMPSON and N. NIEMEYER throughout the investigation, agents have learned the nature of their relationship and communication primarily and principally involves drug trafficking. Because of this, agents believe the Facebook communications will also involve communications related to drug trafficking.

14.     CS-1 stated that N. NIEMEYER is the father of TRENTON NIEMEYER (hereafter T. NIEMEYER), another drug distributor of THOMPSON's, and that THOMPSON came to know the NIEMEYERs through all of their involvement in a local Carpenter's Union. I have since confirmed that both NIEMEYER's and THOMPSON have affiliations with a local Carpenter's Union. The Facebook records received on February 8, 2018 also confirmed that the Target Account was in contact with T. NIEMEYER (user name TRENTON AUSTIN NIEMEYER; User ID 1240631653), and they exchanged a total of five private messages on December 14, 2017, the same day THOMPSON is believed to have met with N. NIEMEYER at the Arrowhead Lanes in Champaign. T. NIEMEYER was recently arrested on February 2, 2018 by the Effingham County Sheriff's Office for possession of 5 to 15 grams of methamphetamine after a traffic stop was conducted for driving with an expired registration.

15.     Another contact of the Target Account includes User ID 100003619438854 with user name MARQUIS THOMPSON. It is believed that "fj.payday," which is the vanity name for the account, is a nickname for FRANK J. DAY (hereafter DAY). This is based off of the initials of

6

his first and middle names (FJ), as well as last name (Day).  DAY is believed to be

THOMPSON's source of supply for crystal methamphetamine ("ice") that resides in

Indianapolis, Indiana.  This account contained several photographs of a black male that appears

to be DAY based off a comparison with his Illinois Identification photo, and agents therefore

believe the account is associated with, and used by, DAY.

16.     A Court Order pursuant to Title 18 United States Section 2703(d) for DAY'S account

was served to Facebook on January 25, 2018, for records and information from October 1, 2016,

through the present.  A review of the records received revealed this is an active account that was

activated on March 19, 2012, and is subscribed to MARQUIS THOMPSON, e-mail addresses

fj.payday@facebook.com and fjpaid87@yahoo.com, with a verified cellular telephone number

of (317) 991-8420.  The Target Account had exchanged a combined total of (75) private

messages and (39) video calls with the account believed to be used by DAY between October 14,

2016 – January 16, 2018.

17.     DAY is believed to be THOMPSON's cousin and has been the subject of previous

narcotics investigations in the Indianapolis, Indiana area, including a prior arrest by the

Indianapolis Police Department for the delivery of methamphetamine in 2012.  CS-1 claimed

that THOMPSON told him/her that his source of supply was his "cousin" in Indianapolis. During

an interview with police on May 5, 2011, regarding a shooting incident at the Marketplace Mall

in Champaign, Illinois, DAY stated that THOMPSON was his cousin.

18.     THOMPSON and DAY have been associated in common criminal activity before. Both

men were convicted for their roles in a shooting at the Marketplace Mall in Champaign, Illinois,

on May 1, 2011. After THOMPSON was allegedly mistreated at a bar, he summoned several

relatives and friends from outside of Illinois, including DAY, to Champaign to help him. One of

the conspirators, THOMPSON's relative Dontrell Thompson, shot Tony Brock inside the mall in retaliation for THOMPSON's alleged mistreatment. THOMPSON pled guilty to conspiracy to commit aggravated battery for his role in the incident. DAY also pled guilty to conspiracy to commit aggravated battery on March 12, 2012. DAY has prior convictions for Possession of Narcotics, Conspiracy to Commit Aggravated Battery, Intimidating a Victim, and Burglary.

19.      Pen register/trap and trace devices (PRTT) obtained on cellular telephone (217) 419-7165 during the course of the investigation have revealed that THOMPSON exchanges several phone calls and text messages with telephone numbers associated with DAY during his frequent trips to Indianapolis to obtain narcotics. From November 8, 2016, through March 7, 2018, the location data for (217) 419-7165 suggests THOMPSON made 91 trips to Indianapolis. Another known Indianapolis trip occurred during a lapse in phone location information on August 1, 2017, meaning THOMPSON has made 92 known Indianapolis trips during this investigation through March 7, 2018. Most of these trips were quick-turn trips, meaning THOMPSON spent little time in Indianapolis before returning to Illinois. Agents quickly noticed that many of THOMPSON's Indianapolis trips occurred very close to his meetings with his "ice" distributors, to include N. NIEMEYER, upon his return to Illinois. For example, on both December 20 and December 23, 2016, just prior to meeting with N. NIEMEYER, THOMPSON traveled to Indianapolis for about an hour before returning to Illinois. Thompson contacted (317) 970-5628, a number known to be used by DAY (through public and proprietary records), prior to and during his Indianapolis trips on December 20 and December 23, 2016, leading agents to believe THOMPSON met with DAY in Indianapolis to obtain drugs. Lawfully seized text message communications suggest THOMPSON ("I Got 2 if u want") and N. NIEMEYER ("Sure") met at the Nike Outlet store in Tuscola on December 23, so THOMPSON could deliver 2 ounces of methamphetamine.

8

20.     In addition, lawfully obtained GPS tracking devices installed on vehicles driven by

THOMPSON revealed that he frequently traveled to Indianapolis residences that public records

show were associated with DAY, including locations on Long River Lane, Ravelle Road and

Grampian Way.  In fact, GPS tracker data has shown THOMPSON traveled to DAY's Grampian

Way address as recently as March 4, 2018.

21.     Another FBI confidential human source (CS-2) has been used in this investigation who

has conducted five controlled purchases of ice and several consensually recorded conversations

with one of MARQUIS THOMPSON's known distributors, KEVIN LEWIS, during the course

of this investigation.  CS-2's information has been corroborated by controlled drug buys,

recorded conversations, physical and electronic surveillance, lawfully obtained text message

communications, and other investigative methods. CS-2 cooperated in hopes of prosecutorial

leniency after being caught with ice in February 2015, and has never been charged for the

incident after his/her cooperation in a previous investigation resulted in the conviction of

multiple individuals on federal drug charges. CS-2's criminal history includes only traffic related

offenses. Throughout the entire period of CS-2's cooperation, his/her information has never been

found to be false or misleading.  For the above stated reasons, I consider CS-2 to be credible and

reliable.

22.     Law enforcement used CS-2 to make a controlled methamphetamine purchase from

LEWIS in Decatur, Illinois on June 30, 2017.  LEWIS agreed to sell CS-2 two ounces of ice in

exchange for $3200.00. CS-2 and LEWIS arranged the deal over the phone on June 28, 2017, at

approximately 8:19 p.m. During the call, LEWIS indicated that he planned to meet his source

(THOMPSON) that night. Shortly after this call, lawfully-obtained phone location information

for LEWIS's phone showed he was traveling toward Champaign.  LEWIS met THOMPSON in

Champaign for a brief time between approximately 9:39 p.m. and 9:55 p.m. that night, then returned to Decatur. Agents confirmed that THOMPSON traveled to meet LEWIS through lawfully-obtained tracking data for a vehicle being driven by THOMPSON showing it in the same locations as LEWIS's phone, location information for THOMPSON's phone (also showing it in the vicinity of LEWIS's phone), and pole camera footage from THOMPSON's apartment after the meeting showing THOMPSON (and only THOMPSON) exiting the vehicle with the GPS tracker installed.  Toll analysis revealed THOMPSON and LEWIS exchanged eight calls and 17 texts that evening.

23.     On June 30, 2017, at approximately 5:05 p.m., CS-2 placed a call to LEWIS at the direction of law enforcement to confirm the transaction that day. During the call, LEWIS told CS-2 that he was on his way to get the two ounces CS-2 had arranged to buy, and that it would take about an hour. Shortly thereafter, LEWIS traveled to meet THOMPSON in Champaign. Much like the meeting on June 28, on June 30 the location information for LEWIS's phone, vehicle tracking information on a vehicle that THOMPSON was known to drive based on the results of electronic/physical surveillance, and location information from THOMPSON's phone (12174197165) suggested LEWIS and THOMPSON met at a McDonald's at 501 N. Mattis Avenue in Champaign. LEWIS and THOMPSON exchanged four calls and 18 text messages in the time leading up to that meeting. After the brief meeting with THOMPSON, LEWIS returned to Decatur and completed the transaction (two ounces of methamphetamine for $3200) with CS-2 at approximately 8:02 p.m. Surveillance units observed LEWIS at the meeting with CS-2, and the buy was recorded in audio and video. On the recording, LEWIS told CS-2 that his girlfriend just drove him to Champaign to get the methamphetamine. Subsequent testing on the drugs

purchased by CHS-2 confirmed the presence of methamphetamine with a substance purity of 100% +/- 4%.

24.    Law enforcement used CS-2 to make a controlled methamphetamine purchase from LEWIS in Decatur, Illinois on March 2, 2018.  LEWIS agreed to sell CS-2 two ounces of ice in exchange for $3200.00. CS-2 and LEWIS arranged the deal over the phone in the morning on March 2, 2018.  Shortly thereafter, PRTT data revealed LEWIS (using 217-519-8117) and THOMPSON (using 217-305-5889) exchanged two text messages and two voice calls.  DAY (using 317-970-5628) then called THOMPSON (using 217-419-7165) at 11:01 a.m. Lawfully obtained GPS tracker data on a vehicle that THOMPSON was driving revealed it was headed eastbound towards Indianapolis. THOMPSON arrived at the Marabou Mills Apartment Complex in Indianapolis and then placed a call to DAY at 11:36 a.m. After going to a gas station, DAY called THOMPSON and then THOMPSON went back to the apartment complex. DAY then called THOMPSON who began traveling east on 34th Street. At 1:34 p.m., DAY called THOMPSON who turned into a small strip mall at 1:41 p.m., which contains A-1 Convenience LLC, a barbershop, and Scotty's Georgetown Lounge located at 4641 W. 30th Street in Indianapolis.  It should be noted that DAY is listed as the owner of A-1 Convenience LLC according to the Indiana Secretary of State business filings website.

25.    Agents observed THOMPSON enter A1 Convenience LLC and a short time later emerge going into the passenger side door a Green Yukon bearing Indiana registration AEU210, which is registered to NICOLE R. BROWN. After going into the Yukon, THOMPSON then gets into his vehicle and departs the area and shortly thereafter departs for Champaign, IL. DAY is observed a little while later walking out to the Green Yukon and entering the vehicle and then going back into A1 Convenience LLC. Based upon information provided by CS-1 and other

information obtained throughout the investigation, agents believe THOMPSON obtained

methamphetamine from the Yukon that was previously placed there by DAY.  Phone traffic

between THOMPSON and DAY throughout the investigation has revealed they frequently

contact each other before THOMPSON travels to Indianapolis and shortly thereafter meets with

his "ice" distributors in Illinois. Agents therefore believe their relationship and communication

primarily involves drug trafficking. Because of this, agents believe the Facebook

communications will also involve communications related to drug trafficking.

26.    Later that day, surveillance observed THOMPSON meet with LEWIS at 4:06 p.m. at the

ValuCheck parking lot, located at 1914 Glenn Park Drive, Champaign, IL.  Just prior to arriving

at the ValuCheck, THOMPSON had been at the Gramercy Park Apartments where he was

parked in front of Building 108.  At 4:10 p.m., THOMPSON and LEWIS (driving separate

vehicles) turned west on White Street and into Gramercy Park Apartments. At 4:11 p.m., GPS

vehicle tracker data indicated THOMPSON drove past Building 108 in Gramercy Park but did

not appear to stop. At 4:11 p.m., THOMPSON turned north onto a dead end road and made a U-

Turn.  PRTT data revealed THOMPSON placed an outgoing call to LEWIS. THOMPSON then,

while remaining in the complex, drove to Kenwood Road and turned east onto another dead end

road and made a U-Turn.  THOMPSON then drove back north and back to Building 108 where

he stopped for approximately 1 minute and 45 seconds, from 4:15:03 until 4:16:48.

THOMPSON then drove to another building on the northeast side of the complex and stopped

there until 4:37 p.m. Agents believe that THOMPSON may have left the "ice" with an individual

in Building 108 at Gramercy Park and had LEWIS obtain the "ice" from that person.

(THOMPSON utilized this same strategy approximately 1 week earlier with LEWIS but on that

occasion, LEWIS rode from the ValuCheck lot to Building 108 with THOMPSON as opposed to

traveling in separate vehicles.)  THOMPSON then likely went back minutes later and met with that same person after LEWIS had left to obtain the cash that LEWIS had provided. At 4:18 p.m., LEWIS was observed traveling back towards Decatur, Illinois.

27.     After the brief meeting with THOMPSON, LEWIS completed the transaction (two ounces of methamphetamine for $3200) with CS-2 at approximately 6:20 p.m. Surveillance units observed LEWIS at the meeting with CS-2, and the buy was recorded in audio and video. The methamphetamine field tested positive and has been sent to the DEA laboratory for further testing.

28.     Based on my training and experience, it is common for drug traffickers to use several different forms of communication to include voice calls, instant messaging, and the use of social media applications such as Facebook to arrange meetings for the delivery of drugs and other transactions.

29.     The use of Facebook communications by two co-conspirators utilizing the same user name (MARQUIS THOMPSON) indicates that the perpetrators of the scheme are regularly using Facebook as a method of communication, such that additional co-conspirators may also be identified through the information associated with the aforementioned Target Facebook account. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) have been committed, are being committed, and will be committed by MARQUIS THOMPSON and other known and unknown persons.

## FACEBOOK OVERVIEW

30.     Your Affiant submitted a preservation request for the Target Facebook Account using the Law Enforcement Online Requests System (https://www.facebook.com/records) pursuant to Title

18, United States Code, Section 2703(f). The Facebook law enforcement response team
provided a receipt indicating the preservation order had been received and the case number
generated for the preservation order is 1423496 which expires on June 15, 2018.

31.     Facebook owns and operates a free-access social networking website of the same name
that can be accessed at http://www.facebook.com. Facebook allows its users to establish
accounts with Facebook, and users can then use their accounts to share written news,
photographs, videos, and other information with other Facebook users, and sometimes with the
general public.

32.     Facebook asks users to provide basic contact and personal identifying information to
Facebook, either during the registration process or thereafter. This information may include the
user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook
security questions and answers (for password retrieval), physical address (including city, state,
and zip code), telephone numbers, screen names, websites, and other personal identifiers.
Facebook also assigns a user identification number to each account.

33.     Facebook users may join one or more groups or networks to connect and interact with
other users who are members of the same group or network. Facebook assigns a group
identification number to each group. A Facebook user can also connect directly with individual
Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request"
accepts the request, then the two users will become "Friends" for purposes of Facebook and can
exchange communications or view information about each other. Each Facebook user's account
includes a list of that user's "Friends" and a "News Feed," which highlights information about the
user's "Friends," such as profile changes, upcoming events, and birthdays.

34.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will

include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. In your affiant's experience, Facebook maintains copies of those messages for a certain period of time even after a Facebook account has been deactivated. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes

stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

43.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

44.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend"

17

requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

47.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

48.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution"

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50.     Therefore, the computers of Facebook may contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## APPLICATION FOR SEALING ORDER

51.     Release of the information contained in this affidavit and related papers will likely hinder

and impede this investigation by revealing the identities of persons interviewed by Agents

conducting the investigation and by providing information which may lead to identification of

informants who have assisted in the investigation.  Public disclosure of information within this

affidavit would have an adverse impact upon the on-going investigation and the ability to gather

additional evidence.  Accordingly, it is respectfully requested that this Application and Affidavit

for Search Warrant and the Search Warrant itself, except for copies as are necessary for its

implementation, be sealed until further Order of the Court so as to not jeopardize this

investigation.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in

particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to

require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.


## CONCLUSION

53.     Based on the forgoing, I respectfully request that the Court issue the proposed search

warrant.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the Court is "a district court of the United States…that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.    Pursuant to 18 U.S.C § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant

56.    The execution of this search warrant would not involve any physical intrusion into anyone's home, office, or personal effects.  Facebook may comply with the search warrant simply by returning records to law enforcement. Your affiant therefore believes that there is good cause for this warrant to be executed at any time, day or night.

s/JUSTIN TENNYSON

Justin Tennyson
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on ___3/8_____, 2018
s/ERIC I. LONG


HONORABLE ERIC I. LONG
United States Magistrate Judge

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the Facebook vanity name "marquis.thompson.963", with associated User ID 100003644581513, from October 1, 2016 – present, that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.  It is requested that the records be returned in a "record archive" file.

## ATTACHMENT B

### Particular Things to be Seized

## I. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) (preservation order number 1423496), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code, telephone numbers, screen names, websites, and other personal identifiers);

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)  All photos and videos uploaded by that user ID;

(d)  All profile information including:  News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; future and past event postings; comments; and tags;

(e)  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)  All "check ins" and other location information;

(g)  All IP logs, including all records of the IP addresses that logged into the account;

(h)  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All past and present lists of friends created by the account;

(j)     All privacy settings and other account settings utilized or created on or after, including privacy settings for individual Facebook posts and activities;

(k)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) involving MARQUIS THOMPSON, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) The use of the Facebook account to facilitate the distribution or sale of illegal drugs, including crystal methamphetamine ("ice").

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the distribution or sale of illegal drugs, including crystal methamphetamine, and to the Facebook account.

(c) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(d) Evidence indicating previous or future deliveries of "ice".

(e) Evidence indicating the amount of "ice" being sold or delivered.

(f) Evidence indicating a method and means of payment for the "ice".

(g) Evidence indicating locations where the "ice" or proceeds from the sale of the "ice" are stored.

(h) Evidence indicating the use of "code words" or other communication methods leading up to, during, and following drug transactions.

(i)  Evidence indicating the identification of co-conspirators and their roles in the distribution of "ice".

(j)  Evidence indicating the Facebook owner or user's state of mind as it relates to the crime under investigation.